UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTHONY MURGIO,<br><br>                      Movant,<br><br>            -v.-<br><br>UNITED STATES OF AMERICA,<br><br>                  Respondent. | 24 Civ. 3650 (KPF)<br><br>15 Cr. 769-1 (KPF)<br><br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

Anthony Murgio was the creator and operator of Coin.mx, an unlicensed online Bitcoin exchange that systematically defrauded banks in order to trick them into processing Bitcoin transactions, often undertaken at the behest of bad actors seeking to hide their cash proceeds.  Mr. Murgio pleaded guilty prior to trial and was sentenced principally to an aggregate term of 66 months' imprisonment.  He served his term of imprisonment and is now on supervised release.  Pending before the Court is Mr. Murgio's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  For the reasons set forth in the remainder of this Order, the Court denies Mr. Murgio's motion.

BACKGROUND[1]

A.    **Factual Background**

Coin.mx, which did business under the names "Collectables Club," "Collecting Club," and "Currency Enthusiasts," was a Florida-based Bitcoin

---

[1]    The underlying criminal conduct for which Mr. Murgio was prosecuted, as well as the extensive procedural history of the prosecution, is detailed in numerous prior opinions, familiarity with which is assumed.  *See, e.g.*, *United States* v. *Murgio*, 209 F. Supp. 3d 698 (S.D.N.Y. 2016) (resolving pretrial motions, including motions to dismiss and for bill of particulars); *United States* v. *Murgio*, No. 15 Cr. 769 (AJN), 2017 WL 365496

exchange service that was owned and operated by Mr. Murgio and others. (*See* Final Presentence Investigation Report ("PSR") (Dkt. #539) ¶ 26). Through Coin.mx, Mr. Murgio and his co-conspirators enabled customers to exchange cash for Bitcoin, charging a fee for their service. During the approximate time period of October 2013 through July 2015, Coin.mx exchanged millions of dollars in fiat currency for Bitcoin on behalf of customers throughout the United States. (*Id.*).

Mr. Murgio and his co-conspirators operated Coin.mx in violation of federal anti-money laundering laws and regulations, including registration and reporting requirements set forth in 18 U.S.C. § 1960 and regulations promulgated by the United States Department of Treasury. (PSR ¶ 27). Indeed, the conspirators engaged in substantial efforts to evade detection of their unlawful Bitcoin exchange scheme by operating through front companies, such as "Collectables Club," and by maintaining corresponding sham websites for those companies. (*Id.* ¶ 28). Among other things, Mr. Murgio and others: (i) opened bank accounts under the false premise that they were being used to service a members-only association of collectables and memorabilia

---

(S.D.N.Y. Jan. 20, 2017) (resolving motions to admit, to preclude, to sever and transfer, and to compel); *United States* v. *Lebedev*, 932 F.3d 40 (2d Cir. 2019) (resolving appeals brought by two co-defendants), *abrogated in part by Ciminelli* v. *United States*, 598 U.S. 306 (2023).

Unless otherwise indicated, references to docket entries are to the docket in Mr. Murgio's criminal case, No. 15 Cr. 769-1 (KPF), and references to page numbers in Mr. Murgio's submissions are to the numbers supplied by this Court's electronic case filing ("ECF") system. For ease of reference, the Court will refer to Mr. Murgio's renewed motion pursuant to 28 U.S.C. § 2255, which includes both his motion form and his supporting memorandum of law, as "Def. Br." (Dkt. #813); to the Government's brief in opposition as "Gov't Opp." (Dkt. #819); and to Mr. Murgio's reply brief as "Def. Reply" (Dkt. #820).

enthusiasts, when in fact they were being used to facilitate Coin.mx's unlawful Bitcoin exchange business; (ii) deceived banks and credit card issuers into authorizing credit and debit card payments and Automated Clearing House ("ACH") transactions to purchase Bitcoin through Coin.mx, including by miscoding and misidentifying transactions, and by structuring the dollar amount of the transactions; and (iii) instructed their customers to lie to banks about the purposes for which their bank-issued credit cards were being used. (*Id.* ¶¶ 29-31). Perhaps unsurprisingly, Coin.mx attracted like-minded customers, including ransomware perpetrators who used (or had their victims use) the service to exchange ransom proceeds for Bitcoin. (*Id.* ¶ 32).

By 2014, the scheme had expanded to include acquiring control of Helping Other People Excel Federal Credit Union ("HOPE FCU"), a New Jersey-based credit union with primarily low-income members. (PSR ¶¶ 33-34). In particular, Trevon Gross, Chairman of the Board of HOPE FCU, allowed and assisted Mr. Murgio and his confederates to take control of the credit union in exchange for bribes paid to bank accounts under Mr. Gross's control. (*Id.* ¶ 33). Once HOPE FCU was under their control, Mr. Murgio and his confederates then obstructed an investigation into that entity by the National Credit Union Administration ("NCUA"). (*Id.* ¶ 34).

## B. Procedural Background

### 1. The Charges and the Guilty Plea

Mr. Murgio was initially charged in a criminal complaint on July 17, 2015, with operating an unlicensed money-transmitting business, money

laundering, and failure to file suspicious activity reports ("SARs") for qualifying offenses, in violation of 18 U.S.C. §§ 371, 1956, 1960, and 2, and 31 U.S.C. §§ 5318(g) and 5322(a).  (Dkt. #1-2).  One week later, on July 21, 2015, Mr. Murgio was arrested in the Middle District of Florida; his first appearance in this District occurred on August 10, 2015.  (Dkt. #4-5, 7-8).

On November 5, 2015, the grand jury returned a sealed indictment against Mr. Murgio charging him with many of the offenses listed in the complaint, as well as conspiracy to make corrupt payments with the intent to influence an officer of a financial institution and bank fraud.  (Dkt. #14).  The matter was initially assigned to then-District Judge Alison J. Nathan.  Over time, the Government obtained superseding indictments charging Mr. Murgio and several co-conspirators, including Yuri Lebedev, Trevon Gross, Jose Freundt, Ricardo Hill, and Mr. Murgio's brother, Michael Murgio, with similar offenses.  (*See, e.g.*, Dkt. #57, 87, 308).

The operative indictment for Mr. Murgio, S6 15 Cr. 769 (AJN) (the "Indictment"), was returned on December 22, 2016, and charged him, Mr. Lebedev, and Mr. Gross with conspiracy to operate an unlicensed money-transmitting business (Count One); the substantive offense of operating an unlicensed money-transmitting business (Count Two); criminal conspiracy (Count Three); making corrupt payments with the intent to influence an officer of a financial institution (Count Four); receiving corrupt payments as an officer of a financial institution (Count Five); conspiracy to commit wire fraud and bank fraud (Count Six); wire fraud (Count Seven); bank fraud (Count Eight);

4

conspiracy to commit money laundering (Count Nine); money laundering
(Count Ten); and aggravated identity theft (Count Eleven).  (Dkt. #308).[2]

Trial in the matter for Messrs. Murgio, Lebedev, and Gross was
scheduled to begin on February 6, 2017.  (Minute Entry for October 11, 2016).
On January 6, 2017, however, the parties advised Judge Nathan of Mr.
Murgio's wish to plead guilty in advance of trial.  (Dkt. #322, 323).  In
particular, Mr. Murgio agreed to plead guilty to Counts One, Three, and Six of
the Indictment pursuant to a plea agreement with the Government.  (Dkt.
#742-1 (plea agreement dated January 6, 2017 (the "Plea Agreement"))).  The
Plea Agreement specifically recited that Mr. Murgio would be pleading guilty to

---

[2]    As discussed *infra*, Mr. Murgio's instant motion is predicated on the Government's use
of the "right to control" theory in its prosecution.  *See generally United States* v. *Carlo*,
507 F.3d 799, 802 (2d Cir. 2007) ("Since a defining feature of most property is the right
to control the asset in question, we have recognized that the property interests
protected by the [mail and wire fraud] statutes include the interest of a victim in
controlling his or her own assets."), *quoted in United States* v. *Binday*, 804 F.3d 558,
570 (2d Cir. 2015), *abrogated by Ciminelli*, 598 U.S. 306.

The Indictment does not indicate in its text that the Government was pursuing a right
to control theory as to any of the charges.  The Court understands from the charge to
the jury given at the trial of two of Mr. Murgio's co-defendants and from their appeal
that the Government pursued such a theory with respect to the wire fraud charges.
(*Compare* Dkt. #505 at 112 (jury charge as to wire fraud: "A person can also be deprived
of money or property when that person is provided false or fraudulent information that,
if believed, would prevent the person from being able to make informed economic
decisions about what to do with his or her money or property.  In other words, a person
is deprived of money or property when that person is deprived of the right to control the
money or property."), *with id.* at 117-18 (jury charge as to bank fraud: "The first
element that the government must prove beyond a reasonable doubt is that there was a
scheme to obtain money or property owned by or under the custody or control of a bank
by means of false or fraudulent pretenses, representations, or promises, as described in
the indictment.")).  *See United States* v. *Lebedev*, 932 F.3d 40, 48 (2d Cir. 2019)
(discussing right to control theory of wire fraud employed by the Government at trial),
*abrogated in part by Ciminelli*, 598 U.S. 306; *see also United States* v. *An*, No. 22 Cr.
460 (KAM), 2024 WL 2010017, at *9 (E.D.N.Y. May 7, 2024) ("In *Lebedev*, the
government explicitly relied on a right-to-control theory to convict the defendant of wire
fraud but relied on a traditional fraud theory to convict the defendant of bank fraud."
(citation omitted)).

subsets of the offenses charged in each count; as to Count Six, for example, the parties clarified that Mr. Murgio would be pleading only to conspiracy to commit bank fraud. (Plea Agreement 2; *see also id.* (reciting relevant offense conduct to include "conspiring, from in or about May 2013 through in or about July 2015, to obtain moneys, funds, and property owned by and under the custody and control of federally insured financial institutions by making material misrepresentations to the financial institutions and others in order to deceive the financial institutions into allowing Coin.mx to operate and process financial transactions through the institutions, as charged in Count Six of the Superseding Indictment")). In addition, the parties stipulated in the Plea Agreement that Mr. Murgio's range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") would be 121 to 151 months' imprisonment. (*Id.* at 3-5). As part of the Plea Agreement, Mr. Murgio agreed to waive his right to appeal, or to collaterally challenge, including by means of an application under 28 U.S.C. § 2255, any term of imprisonment within or below that range and any term of supervised release at or below five years. (*Id.* at 6).

The guilty plea proceeding took place before Judge Nathan on January 9, 2017. (*See* Dkt. #373 (transcript of plea proceedings ("Plea Tr."))). During the proceeding, the Court placed Mr. Murgio under oath and asked him questions to determine his competence to plead guilty. (*Id.* at 3-5). After finding him competent, the Court confirmed with Mr. Murgio that he had reviewed with his counsel the charges to which he proposed to plead guilty, any defenses that he

might have to those charges, and the consequences of entering a guilty plea. (*Id.* at 5).  Mr. Murgio also represented that he was satisfied with counsel's representation of him in the matter.  (*Id.*).  Thereafter, the Court reviewed with Mr. Murgio the rights that he had, and would be waiving, by entering a plea of guilty.  (*Id.* at 5-8).

From there, the Court reviewed with Mr. Murgio the charges in the Indictment to which he intended to plead guilty, which included (i) that portion of Count One that charged Mr. Murgio with conspiracy to operate an unlicensed money-transmitting business without an appropriate state money-transmitting license and without complying with federal money-transmitting business registration requirements; (ii) that portion of Count Three that charged Mr. Murgio with conspiracy to obstruct an investigation of a financial institution; and (iii) that portion of Count Six that charged Mr. Murgio with conspiracy to commit bank fraud.  (Plea Tr. 8-10).  The Court directed one of the prosecutors to outline for the Court and for Mr. Murgio the elements of the offenses to which he proposed to plead guilty; at the conclusion, Mr. Murgio confirmed that he understood "that if you were to go to trial, the government would have to prove all of those elements beyond a reasonable doubt[.]"  (*Id.* at 10-14).  Of potential note, in outlining the elements of the bank fraud offense, the Government did <u>not</u> indicate that it was pursuing liability under a right to control theory.  (*Id.* at 13-14).  The Court then reviewed the penalties associated with the offenses.  (*Id.* at 14-17).

The Court next confirmed with Mr. Murgio that he was pleading guilty pursuant to a written plea agreement with the Government, and reviewed with him the terms of that agreement, including its waiver provisions. (Plea Tr. 18-22; *see also id.* at 21 ("In your plea agreement you have waived your right to appeal or otherwise challenge any sentence that is 151 months or below.")). Mr. Murgio then allocuted to the three offenses:

> For Count One, your Honor, from approximately October 2013 to July 2015, I knowingly participated with others in an illegal plan to operate an unlicensed money transmitting business called Coin.mx. Coin.mx was a Bitcoin exchange that allowed its members to transmit Bitcoin and did business throughout the country, including the Southern District of New York. It operated without a money transmitting license in Florida. It also was not registered as a money services business with the U.S. Department of Treasury's Financial Crimes Enforcement Network. So that's Count One.

> \*\*\*

> And then for Count Three, from about April 2013 to 2015, I knowingly participated with others in an illegal plan to obstruct the examination of HOPE Federal Credit Union by the NCUA. As part of that conspiracy, I participated in the drafting of the submission of a letter to the NCUA that falsely stated that the Collectables Club was headquartered in Lakewood, New Jersey, even though I knew it was based in Florida. This action was undertaken by myself and others to obstruct the NCUA's examination of HOPE FCU which I knew was going on at the time. When I participated in this, I knew what I was doing was wrong.

> \*\*\*

> For Count Six, from about May 2013 through approximately July 2015, I knowingly participated with others in an illegal plan to defraud certain financial institutions to secure banking services for Coin.mx. As

> part of the conspiracy, I opened FDIC-insured bank accounts for Coin.mx at, for example, Citibank, and I intentionally did not disclose that Coin.mx was a Bitcoin exchange. I intentionally omitted information from the banks because I believed that if I did not, the banks would not provide banking services to Coin.mx. I opened up one of those bank accounts in the Southern District of New York.

(*Id.* at 22-23).

The Court also asked for a factual proffer from the Government, which proffer included representations that the Government had evidence showing that: (i) "Murgio opened Coin.mx bank accounts in the name of a phony front company called Collectables Club and miscoded credit and debit card transactions to conceal that those transactions were in fact for Bitcoins"; (ii) "banks would not have opened these accounts or have permitted these transactions if they were aware of the true nature of Coin.mx"; and (iii) "Murgio and others also gained control of HOPE FCU, a federal credit union in New Jersey, by installing Murgio's co-conspirators on the board of the credit union after making a series of payments to accounts that were controlled by the head of the credit union." (Plea Tr. 25-26). At the end of the proceeding, the Court accepted Mr. Murgio's guilty plea. (*Id.* at 29-30).[3]

---

[3]    The trial of Mr. Lebedev and Mr. Gross began on February 13, 2017, and continued until March 17, 2017, when the jury returned guilty verdicts against them. Mr. Lebedev was sentenced principally to a term of 16 months' imprisonment and Mr. Gross was sentenced principally to a term of 60 months' imprisonment. Their convictions and sentences were upheld on appeal. *See Lebedev*, 932 F.3d at 48.

2.      **The Sentencing**

In anticipation of Mr. Murgio's sentencing, the Probation Office prepared a Presentence Investigation Report in which, among other things, it recommended an aggregate term of 96 months' imprisonment.  (PSR, Sentencing Recommendation).  The PSR's recitation of the offense conduct included information about the conspirators' scheme to defraud the banks, which included (i) lying to banks to obtain accounts ostensibly for collectable and memorabilia transactions that were in fact used for Coin.mx's unlawful Bitcoin exchange business; (ii) miscoding and misidentifying unlawful Bitcoin exchange transactions undertaken by Coin.mx's customers so that the banks would allow the transactions to be completed; and (iii) instructing customers to lie about the purposes for which their bank-issued credit cards were being used (*i.e.*, Bitcoin exchange transactions).  (*Id.* ¶¶ 27-32).  After the PSR was issued, Mr. Murgio filed a sentencing submission requesting a term of imprisonment "dramatically less than 96 months" (Dkt. #544 at 3, 20), while the Government sought a term of imprisonment within the stipulated Guidelines range of 121 to 151 months' imprisonment (Dkt. #549 at 1).

Sentencing of Mr. Murgio took place on June 27, 2017.  (Dkt. #562 (transcript of sentencing proceeding ("Sent. Tr."))).[4]  At the beginning of the proceeding, the Court addressed various housekeeping matters, including the resolution of Mr. Murgio's objections to the PSR.  (Sent. Tr. 7-21).  The Court

---

[4]      Judge Nathan deferred resolution of certain restitution and forfeiture issues to a later date.  (Sent. Tr. 4, 6, 73-76).  Because those issues are not implicated by Mr. Murgio's motion, this Court does not discuss them further in this Opinion.

thereafter heard from the parties with respect to their sentencing presentations, and from Mr. Murgio himself.  (*Id.* at 21-65).  Among other things, the Government noted that while cryptocurrency may have been in its nascency, Mr. Murgio "was not helping investors trying to find their way through virtual currencies.  He very well knew that his customers generally were ransomware victims and were people who were using their money on the Darknet." (*Id.* at 22).  For his part, defense counsel argued that Mr. Murgio sought to tamp down on the conspirators' later criminal activity, and that his actions were the product of ambition more than greed.  (*Id.* at 25-26).

The Court then explained its rationale for the sentence it intended to impose:

> Mr. Murgio pled guilty to several very serious offenses: To conspiring to operate an unlicensed money transmitting business, to conspiring to obstruct an examination of a financial institution, and conspiring to commit wire fraud and bank fraud.  And, more specifically, Mr. Murgio led his co-conspirators in a series, as the government said here today, a pyramid of lies, an evasion of law, in order to operate Coin.mx, an unlicensed Bitcoin exchange, that enabled, among other things, the purchases on the Darknet, including some illegal purchases, and that provided a platform for the purchase of bitcoins to be paid in ransomware schemes.
>
> The lies Mr. Murgio and his co-conspirators engaged in to banks and other financial institutions made those entities unwilling participants in the risky and at times illicit transactions.  And in order to further facilitate this risky and unregulated behavior, Mr. Murgio and his co-conspirators bribed a pastor, the head of a small credit union, that serviced a low-income community in order to continue the risky transactions that they hid from federal regulators.

> The regulations and laws in place that were flouted here exist in order to ensure detection of serious crime, to control risk, and to protect the integrity of banking and other financial institutions and ultimately the protection of customers of those institutions.
>
> Mr. Murgio led an effort, based on ambition and greed, that sought to place itself outside of regulation, outside of the law, and such criminal conduct must be met with punishment that reflects the seriousness of the offense, promotes respect for the law, and deters Mr. Murgio and others from engaging in this kind of dangerous and destructive criminal conduct.

(Sent. Tr. 66-67). The Court then balanced those facts with its belief that the loss figure overstated Mr. Murgio's culpability, and with certain of Mr. Murgio's personal characteristics, including the facts that the instant offense was his first conviction and did not involve violence. (*Id.* at 68). It sentenced Mr. Murgio to an aggregate term of 66 months' imprisonment, comprising concurrent 60-month terms on Counts One and Three and a 66-month term on Count Six, followed by an aggregate term of three years' supervised release. (*Id.* at 69).

Judgment was entered on October 25, 2017. (Dkt. #632). Mr. Murgio filed, and then withdrew, a notice of appeal. (Dkt. #650, 733; *see also* Dkt. #749 (amended judgment)). On May 30, 2018, Mr. Murgio filed a motion pursuant to 28 U.S.C. § 2255 claiming that he had received ineffective assistance from his counsel at the time of his guilty plea regarding his potential sentencing exposure. (Dkt. #738). Judge Nathan filed an order to answer the motion (Dkt. #739), and the Government filed an opposition to it on August 6, 2018 (Dkt. #742). After filing his reply submission (Dkt. #746), Mr. Murgio

moved to withdraw his Section 2255 motion (Dkt. #775).  The Court granted the motion to withdraw on August 17, 2020.  (Dkt. #779).

Mr. Murgio was released from prison in January 2022, and began his term of supervised release on January 14, 2022.  On August 25, 2023, Mr. Murgio moved for early termination of his supervised release.  (Dkt. #809).  The Government opposed the motion (Dkt. #811), and the Court denied the request by order dated December 5, 2023, noting, in part, that "completion of Mr. Murgio's full term of supervised release appropriately reflects the seriousness of the offense and adequately promotes deterrence" (Dkt. #812 at 3).

### 3.    The Instant Motion

In May 2023, in *Ciminelli* v. *United States*, 598 U.S. 306 (2023), the Supreme Court considered and rejected the "right to control" theory of wire fraud, concluding that money or property must be the object of an actionable wire fraud scheme.  On May 4, 2024, Mr. Murgio filed a renewed Section 2255 motion *pro se*, arguing that his guilty plea had not been knowing and voluntary, and that his counsel had provided ineffective assistance, because *Ciminelli* made clear that his conduct fell outside of the federal fraud statutes. (Dkt. #813).

The case was transferred to the undersigned on May 14, 2024.  (Dkt. #814).  The Court issued a scheduling order on May 16, 2024.  (Dkt. #815). Pursuant to that order, the Government filed its opposition submission on July 15, 2024 (Dkt. #819), and Mr. Murgio filed his reply on August 15, 2024 (Dkt. #820).

13

## DISCUSSION

**A.      Applicable Law**

**1.      Motions Under 28 U.S.C. § 2255**[5]

A prisoner in federal custody may seek to have his sentence vacated, set aside, or corrected on the grounds that it "was imposed in violation of the Constitution or laws of the United States, or that the [trial] court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]"  28 U.S.C. § 2255(a).  Generally speaking, a petitioner has one year from the latest of several dates, including, as potentially relevant here, "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review."  *Id.* § 2255(f)(3).

The grounds for a collateral attack under Section 2255 are much more limited than those available on a direct appeal.  *See United States* v. *Addonizio*, 442 U.S. 178, 185 (1979).  Relief may lie "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  *United States* v. *Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill* v. *United States*, 368 U.S. 424, 428 (1962)); *accord Cuoco* v. *United States*, 208 F.3d 27, 30 (2d Cir. 2000).

---

[5]      Motions filed pursuant to 28 U.S.C. § 2255 are sometimes referred to as federal habeas petitions.  As a result, courts use the terms "movant," "petitioner," and "defendant" interchangeably.

"It is well established that a § 2255 petition cannot be used to 'relitigate questions which were raised and considered on direct appeal.'" *United States* v. *Sanin*, 252 F.3d 79, 83 (2d Cir. 2001) (quoting *Cabrera* v. *United States*, 972 F.2d 23, 25 (2d Cir. 1992)); *accord United States* v. *Natelli*, 553 F.2d 5, 7 (2d Cir. 1977) ("[O]nce a matter has been decided adversely to a defendant on direct appeal it cannot be relitigated in a collateral attack[.]").  The sole exception is when "there has been an intervening change in the law and the new law would have exonerated a defendant had it been in force before the conviction was affirmed on direct appeal." *Chin* v. *United States*, 622 F.2d 1090, 1092 (2d Cir. 1980).  Section 2255 also precludes a defendant from bringing claims for the first time that could have been raised on direct appeal. *See Bousley* v. *United States*, 523 U.S. 614, 622-23 (1998).  With the exception of claims for ineffective assistance of counsel, *see Massaro* v. *United States*, 538 U.S. 500, 505-06 (2003); *Zhang* v. *United States*, 506 F.3d 162, 166 (2d Cir. 2007), a petitioner who has procedurally defaulted on a claim by failing to raise it on direct appeal, can raise the claim pursuant to Section 2255 only if the petitioner can demonstrate (i) cause for the failure to raise the claim and prejudice from the alleged error, or (ii) actual innocence of the crime. *Bousley*, 523 U.S. at 622-23.

Alternatively, a petitioner may show that the federal court's refusal to consider the merits of his claim will result in a fundamental miscarriage of justice, because he is "actually innocent" of the crimes of which he was convicted. *Aparicio* v. *Artuz*, 269 F.3d 78, 90 (2d Cir. 2001).  A court may find

that a petitioner is actually innocent only when, after reviewing all of the evidence, it concludes that "no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Doe* v. *Menefee*, 391 F.3d 147, 162 (2d Cir. 2004) (internal quotation marks omitted).

Generally speaking, a Section 2255 motion requires a hearing unless files and records conclusively show that the movant is entitled to no relief. *See* 28 U.S.C. § 2255(b); *see also Pham* v. *United States*, 317 F.3d 178, 184 (2d Cir. 2003). That said, the mere filing of a Section 2255 motion does not automatically entitle the movant to a hearing, as, for example, in instances in which a movant's allegations are "vague, conclusory, or palpably incredible." *Machibroda* v. *United States*, 368 U.S. 487, 495 (1962). In addition, it is within the district court's discretion to determine the scope and nature of a hearing. *Chang* v. *United States*, 250 F.3d 79, 85-86 (2d Cir. 2001).

### 2.    Challenges to a Guilty Plea on Collateral Review

Rule 11 of the Federal Rules of Criminal Procedure "sets forth requirements for a plea allocution and 'is designed to ensure that a defendant's plea of guilty is a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *United States* v. *Andrades*, 169 F.3d 131, 133 (2d Cir. 1999) (citation omitted). Among other things, Rule 11 requires the district court, after placing the defendant under oath, to address the defendant personally in open court and "inform the defendant of, and determine that the defendant understands" fifteen specific things, including: "the defendant's waiver of [certain specified] trial rights if the court accepts a

16

plea of guilty," Fed. R. Crim. P. 11(b)(1)(F); "the nature of each charge to which the defendant is pleading," Fed. R. Crim. P. 11(b)(1)(G); "any maximum possible penalty, including imprisonment, fine, and term of supervised release," Fed. R. Crim. P. 11(b)(1)(H); and "the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence," Fed. R. Crim. P. 11(b)(1)(N).  "A variance from the requirements of [Rule 11] is harmless error if it does not affect substantial rights."  Fed. R. Crim. P. 11(h).  However, the Second Circuit has recognized that, on rare occasions, an error during a guilty plea proceeding can support a collateral challenge:

> Where a Rule 11 challenge is brought in a motion under [28] U.S.C. § 2255, the "movant can successfully challenge [the] guilty plea conviction … only by establishing that the violation constituted a constitutional or jurisdictional error, or by showing that the error resulted in a complete miscarriage of justice or in a proceeding inconsistent with the rudimentary demands of fair procedure." *Lucas* v. *United States*, 963 F.2d 8, 12-13 (2d Cir. 1992) (internal quotations and citations omitted).  The movant must also show prejudice, meaning that "he did not understand the consequences of his plea, or that, if he had been properly advised, he would not have pled guilty." *Id.* at 13.

*Rojas* v. *United States*, 803 F. App'x 526, 528 (2d Cir. 2020) (summary order).

### 3. Ineffectiveness Claims on Collateral Review

Another potential basis for relief under Section 2255 occurs when a petitioner has received the ineffective assistance of counsel.  A defendant in a criminal proceeding has a right under the Sixth Amendment to effective assistance from his attorney at all critical stages of the proceeding, including the entry of a guilty plea.  *See, e.g.*, *Hill* v. *Lockhart*, 474 U.S. 52, 58 (1985).

17

In order to succeed on a claim of ineffective assistance of counsel, a petitioner must meet the two-pronged test established by *Strickland* v. *Washington*, 466 U.S. 668 (1984). *First*, the petitioner must show that his counsel's representation was deficient, falling below the objective standard of reasonableness. *See id.* at 687-88. During this first step, the standard of review is highly deferential and includes "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "This presumption is overcome only if counsel failed to act reasonably considering all of the circumstances." *United States* v. *Rosemond*, 958 F.3d 111, 121 (2d Cir. 2020).

*Second*, the petitioner must establish that his counsel's errors resulted in actual prejudice. *See Strickland*, 466 U.S. at 694. A petitioner satisfies this second prong by proving that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*; *see also United States* v. *Nolan*, 956 F.3d 71, 79 (2d Cir. 2020). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Garner* v. *Lee*, 908 F.3d 845, 862 (2d Cir. 2018).

In the specific context of guilty pleas, the prejudice analysis "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill* v. *Lockhart*, 474 U.S. at 59; *see also Kovacs* v.

18

*United States*, 744 F.3d 44, 51-52 (2d Cir. 2014) (discussing various ways that prejudice may be shown in guilty plea context, including a forgone decision to proceed to trial or a more advantageous plea offer).

A court is not required to address *Strickland*'s elements in any particular order. *See Strickland*, 466 U.S. at 697. If the petitioner does not successfully establish either the performance prong or the prejudice prong, the entire claim fails, and the remaining, unaddressed step becomes moot. *See id.*

**B. Analysis**

**1. The Court Has Jurisdiction to Consider the Motion**

The Court begins by confirming that it has subject matter jurisdiction to consider Mr. Murgio's motion. *See generally Arbaugh* v. *Y&H Corp.*, 546 U.S. 500, 514 (2006). A petitioner may only seek Section 2255 relief if he is "in custody." 28 U.S.C. § 2255(a). The "in custody" requirement is jurisdictional, meaning that a court may not adjudicate the motion if the requirement is not met. *United States* v. *Rutigliano*, 887 F.3d 98, 104 (2d Cir. 2018). So long as the requirement was met "[a]t the time [the] defendant[ ] filed the [Section 2255] motion[ ]," however, the defendant's subsequent release from custody will not necessarily divest the court of jurisdiction. *Id.* At the time his Section 2255 motion was filed, and continuing to today, Mr. Murgio satisfied the "in custody" requirement. *See Peck* v. *United States*, 73 F.3d 1220, 1224 n.5 (2d Cir. 1995) ("[Defendant] has completed his prison term since his petition was denied ... and is presently serving a three-year term of supervised release. Although he is no longer in prison, a term of supervised release, which carries

19

with it the possibility of revocation and additional jail time, satisfies the 'in custody' requirement of § 2255." (citations omitted)); *accord Scanio* v. *United States*, 37 F.3d 858, 860 (2d Cir. 1994).

Nor has Mr. Murgio's release from custody rendered his Section 2255 motion moot. *See generally Carrenard* v. *United States*, No. 21 Cr. 506 (ER), 2024 WL 4238704, at *1 n.1 (S.D.N.Y. Sept. 19, 2024) (discussing mootness issues that arise in the Section 2255 context). In this regard, while it is true that a criminal case does not "necessarily become moot when [an] [inmate] finishes serving the sentence," it will only remain a live case or controversy if there exists "some concrete and continuing injury or collateral consequence resulting from the conviction." *United States* v. *Mercurris*, 192 F.3d 290, 293 (2d Cir. 1999) (internal quotation marks omitted) (quoting *Spencer* v. *Kemna*, 523 U.S. 1, 7 (1998)); *accord United States* v. *Martin*, 974 F.3d 124, 140-41 (2d Cir. 2020). Where, as here, the petitioner challenges his criminal conviction, the Supreme Court "has been willing to presume the existence of collateral consequences sufficient to satisfy the case or controversy requirement," or has at least been willing "to count collateral consequences that are remote and unlikely to occur." *See id.* (emphasis omitted) (quoting *United States* v. *Probber*, 170 F.3d 345, 348 (2d Cir. 1999)); *see also Nowakowski* v. *New York*, 835 F.3d 210, 217-18 (2d Cir. 2016) (discussing the presumption of continuing collateral consequences).

2.    **The Court Either Rejects, or Does Not Resolve, the Government's Procedural Challenges to Mr. Murgio's Motion**

In its opposition, the Government posits several procedural hurdles to Mr. Murgio's motion, including claims that the motion is barred by the waiver provision in Mr. Murgio's Plea Agreement, that it is untimely, and that it is legally irrelevant in light of the concurrent sentence doctrine.  (Gov't Opp. 6-9).  Because these arguments are not the silver bullets the Government believes them to be, the Court will address them briefly before turning to the merits of Mr. Murgio's claims.

The Court first addresses the Government's waiver argument.  As noted, Mr. Murgio's Plea Agreement contained a waiver provision in which he, among other things, agreed not to bring a collateral challenge to any term of imprisonment within the stipulated Guidelines range of 121 to 151 months, or to any term of supervised release at or below five years (Plea Agreement 6-7), and he was specifically allocuted on the waiver provision during his plea proceeding (Plea Tr. 21).  The Second Circuit has made clear that "[a] defendant's knowing and voluntary waiver of the right to appeal or collaterally attack his conviction and/or sentence is enforceable."  *Sanford* v. *United States*, 841 F.3d 578, 580 (2d Cir. 2016) (collecting cases); *see also Frederick* v. *Warden, Lewisburg Corr. Facility*, 308 F.3d 192, 195-96 (2d Cir. 2002) (discussing waiver of collateral attack rights).  Second Circuit precedent also "foreclose[s] the possibility that a plea agreement can be nullified by a change in law after the agreement is executed."  *Unites States* v. *Riggi*, 649 F.3d 143, 149 n.7 (2d Cir. 2011); *see also Sanford*, 841 F.3d at 580 ("[A] defendant's

inability to foresee [a change in the law] does not supply a basis for failing to enforce an appeal waiver." (internal quotation marks omitted)); *see also United States* v. *Santiago*, 806 F. App'x 32, 34 (2d Cir. 2020) (summary order) (rejecting argument that appeal waiver in plea agreement was nullified by subsequent change in law).

    That said, the waiver analysis here is complicated by Mr. Murgio's current arguments of ineffective assistance of counsel in connection with his guilty plea. (*See* Def. Reply 7-8; *see also* Plea Agreement 6-7 ("Notwithstanding the foregoing, nothing in this paragraph shall be construed to be a waiver of whatever rights the defendant may have to assert claims of ineffective assistance of counsel, whether on direct appeal, collateral review, or otherwise. Rather, it is expressly agreed that the defendant reserves those rights.")). *See generally United States* v. *McCullough*, No. 21-842, 2022 WL 17724712, at *2 (2d Cir. Dec. 16, 2022) (summary order) ("We therefore provisionally dismiss McCullough's challenge to the error in his sentence as barred by his appeal waiver without prejudice to his raising the issue again should he succeed 'in proving that his appeal waiver should be voided because he received ineffective assistance of counsel.'" (quoting *United States* v. *Oladimeji*, 463 F.3d 152, 155 (2d Cir. 2006))); *United States* v. *Hernandez*, 242 F.3d 110, 113-14 (2d Cir. 2001) (finding that waiver of appellate or collateral challenge rights in a plea agreement may be unenforceable where petitioner claims ineffective assistance of counsel in connection with plea agreement itself). In other words, in order for the Court to determine the effectiveness of the waiver provision, it will have

to consider the merits of Mr. Murgio's claims, to see whether his counsel in fact provided ineffective assistance in connection with the guilty plea.

As a second line of attack, the Government argues that Mr. Murgio's motion is untimely. (Gov't Opp. 8-9). To that end, the Government rejects Mr. Murgio's argument that the *Ciminelli* decision is a "right [that] has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." *See* 28 U.S.C. § 2255(f)(3). Once again, however, the record is not so clear.

As a court in this Circuit has explained:

> Section 2255(f)(3) anticipates that in appropriate cases, the federal courts may apply a Supreme Court decision retroactively despite the expiration of the one-year statute of limitations. In such cases, the one-year limitations period runs from "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." 28 U.S.C. § 2255(f)(3). The statute requires two events: a right newly recognized by the Supreme Court and a judicial ruling that the right applies retroactively. *See Dodd* v. *United States*, 545 U.S. 353 (2005). It is generally accepted that the second requirement may be furnished by a decision at the circuit or district levels. *See Ashley* v. *United States*, 266 F.3d 671, 673 (7th Cir. 2001) ("District and appellate courts, no less than the Supreme Court, may issue opinions 'holding' that a decision applies retroactively to cases on collateral review."); *United States* v. *Olvera*, 775 F.3d 726, 730, fn.11 (5th Cir. 2015) ("[Section] 2253(f)(3) does not require that the retroactivity determination must be made by the Supreme Court itself").

*United States* v. *Pilcher*, No. 14 Cr. 58 (GWC), 2020 WL 7350843, at *2 (D. Vt. Dec. 14, 2020). The few cases to have considered the issue have suggested

that *Ciminelli* is a new rule of substantive law that is "presumptively retroactive." *See, e.g.*, *Johnson* v. *United States*, No. 23 Civ. 5600 (NGG), 2024 WL 1740916, at *6 (E.D.N.Y. Apr. 23, 2024) ("In considering whether circumstances compel granting of the writ to achieve justice, 'a new rule of substantive criminal law is presumptively retroactive because a defendant may have been punished for conduct that simply is not illegal.' This includes substantive changes in the controlling interpretation of criminal statutes. The Supreme Court invalidating the right-to-control theory in *Ciminelli* may therefore serve as a basis for *coram nobis* relief for defendants convicted under this theory." (internal citations omitted)); *cf. Alfaro* v. *United States*, No. SA-18-CR-879-FB-1, 2024 WL 2194852, at *4 (W.D. Tex. May 14, 2024) (observing, in *dicta*, that "[s]ince the Supreme Court invalidating the right-to-control theory in *Ciminelli*, the holding may therefore serve as a basis for habeas relief for a defendant convicted under this theory as it places certain kinds of conduct beyond the power of the criminal law to proscribe").[6]

What is more, decisions in other contexts suggest that *Ciminelli* would be retroactively applicable under the traditional analysis in *Teague* v. *Lane*, 489

---

[6]    In *Binday* v. *United States*, No. 21-1206, 2024 WL 2965245, at *1 (2d Cir. May 6, 2024), *cert. denied*, No. 23-1290, 2024 WL 4426647 (U.S. Oct. 7, 2024), the Second Circuit declined to allow the petitioner to file a second or successive Section 2255 motion, reasoning that "*Ciminelli* did not announce a new rule of constitutional law, as required by § 2255(h)(2), but merely a rule of statutory construction." *See* 28 U.S.C. § 2255(h)(2) (allowing second or successive motion under 28 U.S.C. § 2255 where panel certifies that motion contains "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable"). However, as Mr. Murgio notes (Def. Reply 3), the standard set forth in 28 U.S.C. § 2255(f)(3) is different, and requires only a newly recognized right made applicable to cases on collateral review.

U.S. 288 (1989).[7]  *See, e.g.*, *Schriro* v. *Summerlin*, 542 U.S. 348, 351-53 (2004) ("A rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes," which "includes decisions that narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish." (internal citations omitted)); *Hall* v. *United States*, 58 F.4th 55 (2d Cir. 2023) (concluding that Supreme Court decision in *United States* v. *Davis*, 588 U.S. 445 (2019), which found residual clause in definition of "crime of violence" in 18 U.S.C. § 924(c) to be unconstitutionally vague, reflected a new substantive rule of constitutional criminal law that was applicable retroactively on collateral review).  Given the current state of the law, this Court is loath to find Mr. Murgio's motion to be untimely, particularly since, as discussed in the next section, it can resolve his claims on the merits.

Finally, the Government argues that the Court can decline to consider Mr. Murgio's arguments under the concurrent sentence doctrine, which "allows

---

[7]    *See generally Hall* v. *United States*, 58 F.4th 55, 60 (2d Cir. 2023):

> The framework for determining whether a decision applies retroactively to cases on collateral review is set forth by the plurality opinion in *Teague* v. *Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).  *See Welch* v. *United States*, 578 U.S. 120, 128, 136 S.Ct. 1257, 194 L.Ed.2d 387 (2016).  "Under *Teague*, as a general matter, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced" unless they fall under an established exception.  *Id.* (quoting *Teague*, 489 U.S. at 310, 109 S.Ct. 1060).  As relevant here, one of those exceptions is for "new substantive rules," which "generally apply retroactively."  *Id.* (quoting *Schriro* v. *Summerlin*, 542 U.S. 348, 351, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004)) (emphasis omitted).

courts, in their discretion, to avoid reaching the merits of a claim altogether in the presence of identical concurrent sentences since a ruling in the defendant's favor would not reduce the time he is required to serve or otherwise prejudice him in any way." *Kassir* v. *United States*, 3 F.4th 556, 561 (2d Cir. 2021). However, the concurrent sentence doctrine is "[f]ar from [mandatory]." *Id.* at 568. Rather, it is "a rule of judicial convenience[,]" *id.* at 561, and "whether or not to [apply it] rests in the Court's discretion," *United States* v. *Padilla*, No. 94 Cr. 313 (CSH), 2024 WL 1413979, at *6 (S.D.N.Y. Apr. 2, 2024). For reasons similar to its timeliness analysis, the Court exercises its discretion to consider the merits of Mr. Murgio's claims.

### 3. There Is No Basis for Vacatur

Mr. Murgio brings two claims for vacatur of his convictions, the first addressing the voluntariness of his guilty plea and the second addressing the effectiveness of his representation. (*See* Def. Br.; Def. Reply).[8] As described above, both types of claims can, in certain circumstances, support a collateral attack on a conviction. Here, however, both claims distill to a single inquiry: whether Mr. Murgio's conviction on Count Six was impacted by *Ciminelli.* Ultimately, the Court finds that it was not, and accordingly rejects both claims.

The *Ciminelli* case concerned a bid-rigging scheme arising from then-New York Governor Andrew Cuomo's "Buffalo Billion" initiative; for his role in the

---

[8]     Though Mr. Murgio's challenges only apply to Count Six, he suggests that "the *Ciminelli* claim goes to the validity of the plea on all counts." (Def. Reply 2). The Court disagrees with this portion of his argument, but finds the point to be academic in light of its resolution of the motion.

scheme, Ciminelli was charged with wire fraud and conspiracy to commit wire fraud.  *Ciminelli* v. *United States*, 598 U.S. 306, 310 (2023).  The wire fraud offense requires proof of (i) an intent to defraud, (ii) a scheme or artifice to defraud involving material misrepresentations, and (iii) use of interstate or international mails or wires to further that scheme.  *See United States* v. *Caltabiano*, 871 F.3d 210, 218 (2d Cir. 2017).  The term "to defraud," in turn, refers to "wronging one in his property rights."  *Cleveland* v. *United States*, 531 U.S. 12, 19 (2000); *McNally* v. *United States*, 483 U.S. 350, 358 (1987).

Prior to *Ciminelli*, the Second Circuit had considered qualifying "property rights" to include the right to control potentially valuable economic information necessary to make discretionary economic decisions.  *See generally United States* v. *Wallach*, 935 F.2d 445, 462-63 (2d Cir. 1991); *see also United States* v. *Binday*, 804 F.3d 558, 569 (2d Cir. 2015).  A defendant could be convicted under a right to control theory, for example, if the scheme "affected the victim's economic calculus or the benefits and burdens of the agreement, pertained to the quality of services bargained for, or exposed the victim to unexpected economic risk."  *United States* v. *Percoco*, 13 F.4th 158, 170 (2d Cir. 2021), *rev'd and remanded sub nom. Ciminelli*, 598 U.S. 306.  Ciminelli's wire fraud charges were premised on a right to control theory; he was convicted at trial, and his convictions were upheld by the Second Circuit.  *Ciminelli*, 598 U.S. at 310-12.

In *Ciminelli*, the Supreme Court rejected the right to control theory, concluding that because "the wire fraud statute reaches only traditional

27

property interests," the "right-to-control theory cannot form the basis for a conviction under the federal fraud statutes." *Ciminelli*, 598 U.S. at 316; *see also id.* at 309 ("We have held, however, that the federal fraud statutes criminalize only schemes to deprive people of traditional property interests. Because 'potentially valuable economic information' 'necessary to make discretionary economic decisions' is not a traditional property interest, we now hold that the right-to-control theory is not a valid basis for liability under § 1343." (internal citation omitted)).  And because Ciminelli's indictment and conviction had been predicated solely on a right to control theory of wire fraud, the case was remanded back to the Second Circuit for further proceedings.  *Id.*; *see also United States* v. *Aiello*, 118 F.4th 291, 301-02 (2d Cir. 2024) (remanding Ciminelli's case to the district court for retrial under a "traditional property theory of wire fraud").

As an initial matter, it is unclear if the *Ciminelli* holding extends to the bank fraud statute.  *Compare United States* v. *Motovich*, No. 21 Cr. 497 (WFK), 2024 WL 2943960, at *6 (E.D.N.Y. June 11, 2024) ("Even assuming arguendo that *Ciminelli*'s holding regarding the federal wire fraud statute applies in the bank fraud context, it would not apply in this case."), *with United States* v. *An*, — F. Supp. 3d. —, No. 22 Cr. 460 (KAM), 2024 WL 2010017, at *7 (E.D.N.Y. May 7, 2024) ("Although *Ciminelli* itself concerned the propriety of a jury instruction under the federal wire fraud statute, the opinion spoke in terms of 'the federal fraud statutes,' so its requirement that a fraud scheme deprive the victim of a 'traditional property interest' would appear also to apply to the

federal bank fraud statute."). The Court assumes that it does, but concludes that it offers no aid to Mr. Murgio in challenging his conviction for bank fraud conspiracy.

Put simply, Mr. Murgio was prosecuted for a bank fraud conspiracy that did not implicate a right to control theory. As the Second Circuit has explained:

> "[B]ank fraud is defined as the knowing execution of 'a scheme or artifice — (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.'" *United States* v. *Calderon*, 944 F.3d 72, 91 (2d Cir. 2019) (quoting 18 U.S.C. § 1344). "[P]roof of the violation of either subsection is sufficient to support a conviction." *United States* v. *Crisci*, 273 F.3d 235, 239 (2d Cir. 2001). Both subsections require the government to "prove that the defendant in question engaged in a deceptive course of conduct by making material misrepresentations." *Calderon*, 944 F.3d at 85 (emphasis in original). Although Section 1344(1) requires the intent to defraud a financial institution, Section 1344(2) only requires the intent to obtain bank property. *Loughrin* v. *United States*, 573 U.S. 351, 355-57 (2014); *accord United States* v. *Bouchard*, 828 F.3d 116, 124 (2d Cir. 2016). Accordingly, Section 1344(2) covers situations in which a defendant, intending to obtain bank property, makes a false representation to a third party, rather than the bank itself. *See, e.g.*, *Shaw* v. *United States*, 580 U.S. 63, 71 (2016) ("[Section 1344(2)] applies to a circumstance in which a shopper makes a false statement to a department store cashier in order to pay for goods with money 'under the custody or control of a financial institution' ...."); *Loughrin*, 573 U.S. at 363 n.6 ("[W]hen the defendant has the requisite intent to acquire bank property, his presentation of a forged or altered check to a third party satisfies § 1344(2)'s 'means' requirement.").

*United States* v. *Vidal*, No. 22-2857-cr, 2024 WL 397630, at *1 (2d Cir. Feb. 2, 2024). Neither paragraph requires the Government to prove actual harm to the bank. Section 1344(1) "demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss." *Shaw*, 580 U.S. at 67. Similarly, Section 1344(2) does not require "the Government to prove that the defendant's scheme created a risk of financial loss to the bank." *Loughrin*, 573 U.S. at 366 n.9.

Mr. Murgio was charged with an offense under Section 1344(2). (*See* Indictment ¶ 35 ("ANTHONY R. MURGIO … would and did execute and attempt to execute a scheme and artifice to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, financial institutions"); Plea Tr. 13 (Government describing elements of Count Six to include "a scheme or artifice to obtain money, funds, or other property owned or under the custody or control of a financial institution, by means of materially false or fraudulent pretenses, representations, or promises")). The Government's theory of the case was that banks were deprived of property in the form of the accounts that they were deceived into opening for Coin.mx to use and, more specifically, the funds that flowed through those accounts as the banks processed credit card, debit card, and other transactions for Coin.mx and its customers. (Plea Tr. 25-26). While Mr. Murgio appeared to cover both paragraphs of Section 1344 in his allocution (*see* Plea Tr. 23 ("For Count Six, from about May 2013 through approximately July 2015, I knowingly participated with others in an illegal plan to defraud certain financial

institutions to secure banking services for Coin.mx.")), his allocution clearly suffced under Section 1344(2) (*see id.* ("As part of the conspiracy, I opened FDIC-insured bank accounts for Coin.mx at, for example, Citibank, and I intentionally did not disclose that Coin.mx was a Bitcoin exchange.  I intentionally omitted information from the banks because I believed that if I did not, the banks would not provide banking services to Coin.mx.")).  What is equally clear is that the bank fraud offense to which Mr. Murgio pleaded guilty was a scheme to deprive the banks of money or property, and <u>not</u> a scheme to deprive the banks of information necessary to make discretionary economic decisions.  As such, Mr. Murgio's conviction under Count Six was not impacted by *Ciminelli*.

In a case involving substantively identical facts, a sister court in this District rejected a similar *Ciminelli* challenge.  The defendant in *United States* v. *Bankman-Fried*, 680 F. Supp. 3d 289, 305 (S.D.N.Y. 2023), had been charged with conspiracy to commit bank fraud based on false representations that a bank account "would be used for trading and market making," when in fact it was used to receive and transmit customer deposits and fees for the FTX cryptocurrency exchange.  *Id.*  The defendant argued that the charge should be dismissed "because it alleges a 'right to control' theory of property that is no longer viable under *Ciminelli*."  *Id.*  Judge Kaplan denied the motion to dismiss, concluding:

> *Ciminelli* is inapposite because the S5 Indictment alleges that the defendant conspired to induce a bank to open an account, which was used to receive FTX

> customer deposits and from which the defendant and
> his co-conspirators "regularly took money" from the
> bank's custody.  There is no requirement under the
> bank fraud statute that a scheme to obtain money or
> property must "create[ ] a risk of financial loss to the
> bank."  Rather, the Supreme Court has held that "for
> purposes of the bank fraud statute, a scheme
> fraudulently to obtain funds from a bank depositor's
> account normally is also a scheme fraudulently to
> obtain property from a 'financial institution,' at least
> where ... the defendant knew that the bank held the
> deposits, the funds obtained came from the deposit
> account, and the defendant misled the bank in order to
> obtain those funds."  Thus, the indictment plainly
> alleges a scheme to obtain "money or property," not a
> scheme to deprive a bank of "valuable economic
> information."

*Id.* (internal citations omitted); *see also id.* at 306-07 (rejecting similar

challenge to nexus requirement of 18 U.S.C. § 1344(2): "The S5 Indictment

alleges that the defendant conspired to send false information to a financial

institution to disguise the true nature of an account and to obtain funds from

that account that were in the custody and control of the financial institution.

Accordingly, the indictment sufficiently alleges a nexus between the alleged

misrepresentations and the defendant's alleged procurement of property from

the bank.").

   A district court in the Eastern District of New York concluded likewise in

a case in which bank fraud was alleged to be the specified unlawful offense of a

money laundering charge.  *See United States* v. *An*, No. 22 Cr. 460 (KAM), 2024

WL 2010017 (E.D.N.Y. May 7, 2024).  As relevant here, the Government had

argued that the defendants "conspired with others" to "engage[ ] in deceptive

tactics" in order to evade American banks' anti-money laundering controls and

thereby "enjoy continued access" to American bank accounts.  *Id.* at *6.  The defendants argued that "continued access" was simply a euphemism for the now-discredited right to control theory, but Judge Matsumoto rejected their claims, finding that "the Indictment in this case frames the harm to the banks as the [defendants'] deprivation of deposited funds in accounts held by the victim banks.  That distinction matters."  *Id.* at *7; *see also id.* at *8 ("*Ciminelli* did not reject the premise that depriving a victim of information in order to induce the victim to part with traditional property can be fraud.  *Ciminelli* simply rejected the notion that *information itself can be property.*"); *see also Motovich*, 2024 WL 2943960, at *6 ("Even assuming arguendo that *Ciminelli*'s holding regarding the federal wire fraud statute applies in the bank fraud context, it would not apply in this case.  The Indictment does not allege a right-to-control theory, instead alleging the object of Defendants' bank fraud offenses was bank property, *i.e.*, funds in the Shell Company Bank Accounts.").

The reasoning of these courts is persuasive, and it imperils the instant claims.  Mr. Murgio was charged with, and pleaded to, a bank fraud conspiracy that implicated traditional property interests, and not the right to control theory.  There is no legal defect in his Count Six conviction.  Moreover, given the care with which Judge Nathan took his guilty plea, there is no basis to believe that Mr. Murgio did not understand the charge to which he was pleading guilty or the waiver contained in his Plea Agreement, and no basis to find that he received ineffective assistance of counsel in connection with his plea.  Finally, there is no basis to conclude that Mr. Murgio is actually innocent

of the bank fraud conspiracy to which he pleaded guilty.  For all of these reasons, there is no basis to invalidate the collateral attack waiver in Mr. Murgio's Plea Agreement, and no basis to invalidate any of his counts of conviction.

## CONCLUSION

For the reasons set forth in this Opinion, the Court DENIES Mr. Murgio's motion pursuant to 28 U.S.C. § 2255.  The Clerk of Court is directed to terminate the motion pending at docket entry 813 in Case No. 15 Cr. 769-1; to docket this Opinion in Case Nos. 15 Cr. 769-1 and 24 Civ. 3650; to close Case No. 24 Civ. 3650; and to mail a copy of this Opinion to Mr. Murgio at his address of record.

Because Mr. Murgio has not made a substantial showing of the denial of a constitutional right with respect to his motion, the Court will not issue a certificate of appealability.  *See* 28 U.S.C. § 2253(c).  Additionally, the Court finds that, pursuant to 28 U.S.C. § 1915(a)(3), any appeal from this Opinion would not be taken in good faith; *in forma pauperis* status is therefore denied for the purpose of any appeal.  *See Coppedge* v. *United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

Dated:  November 21, 2024
        New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge

34